### INTERNATIONAL RAW MATERIALS, LTD.

v.

### STAUFFER CHEMICAL COMPANY, TG Soda Ash, Inc., General Chemical Partners, Tenneco Minerals Company, FMC Wyoming Corp., Kerr–McGee Chemical Corp., American Natural Soda Ash Corporation.

Civ. A. No. 87–7541.

United States District Court, E.D. Pennsylvania.

June 22, 1989.

---

David Berger, H. Laddie Montague, Jr., Howard Langer and Jeffrey Rockman of Berger & Montague, P.C., and David H. Marston of Buchanan Ingersoll, P.C., Philadelphia, Pa., for plaintiff Intern. Raw Materials, Ltd.

Norman H. Seidler, Charles H. Critchlow, James R. Eiszner, and David A. Schwartz–Leeper of Coudert Bros., New York City, for defendants American Natural Soda Ash Corp., Stauffer Chemical Co., Tg Soda Ash, Inc., General Chemical (Soda Ash) Partners, and Tenneco Minerals Co.

Patrick W. Kittredge of Kittredge & Donley, Philadelphia, Pa., for defendants American Natural Soda Ash Corp., Stauffer Chemical Co., Tg Soda Ash, Inc., General Chemical (Soda Ash) Partners, FMC Wyoming Corp. and Tenneco Minerals Co.

M. Mason Pattillo, Shelton, Conn., for defendant Stauffer Chemical Co.

Edward J. Waite, Parsippany, N.J., for defendant General Chemical Partners.

Eugene G. McGuire, Stamford, Conn., for defendant Tg Soda Ash, Inc.

John N. Badger, Lakewood, Colo., and Stephen W. Armstrong of Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for defendant Tenneco Minerals Co.

Alan R. Kidston, William R. Jentes and Mark E. Ferguson of Kirkland & Ellis, Chicago, Ill., for defendant FMC Wyoming Corp.

Carolyn G. Hill, Oklahoma City, Okl., and Alfred H. Wilcox of Pepper, Hamilton & Scheetz, Philadelphia, Pa., and Thomas W. Johnston of Keck, Mahin & Cate, Chicago, Ill., for defendant Kerr–McGee Chemical Corp.

## MEMORANDUM AND ORDER

HANNUM, Senior District Judge.

### Background

The issue before the Court is the extent of an export trade association's antitrust exemption under the Webb–Pomerene Act, 15 U.S.C. § 61 *et seq.* Plaintiff International Raw Materials, Ltd. ("IRM") operates a Port Longview, Washington terminal used for loading soda ash onto ocean-going vessels. Defendants are the American Natural Soda Ash Corporation, an export trade association registered with the Federal Trade Commission under the Webb–Pomerene Act, and all of the member organizations of this association ("ANSAC defendants" or "ANSAC"). In response to IRM's allegations of antitrust violations [1], the ANSAC defendants have moved for dismissal pursuant to Fed.R.Civ.P. 12(b)(6),

---

1. In its complaint filed on November 23, 1987, IRM seeks treble damages and injunctive relief under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for defendants' violations of the Sherman Act, 15 U.S.C. §§ 1 and 2.

claiming that, as a matter of law, provisions of the Webb–Pomerene Act exempt them from liability. With the submission of supporting affidavits,[2] this motion is properly treated as a motion for summary judgment under Fed.R.Civ.P. 56. *See Carter v. Stanton*, 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972).

By its complaint, IRM seeks remedy for ANSAC's horizontal price-fixing of domestic terminalling rates for the export of soda ash. There is no dispute that ANSAC acts as an independent marketing agent for its members—arranging joint shipment and distribution of its members soda ash for export. Citing its registration under the Webb–Pomerene Act, ANSAC claims that their efforts to seek the most efficient terminalling rates for these shipments are exempt from Sherman Act provisions because these efforts are in the course of export trade. IRM opposes dismissal both on grounds that there are material factual disputes over whether ANSAC can avail itself of Webb–Pomerene and on grounds that Webb–Pomerene does not protect the kind of violations that IRM has alleged.

*Discussion*

Summary judgment must be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Under the guidance of *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), "[f]or a dispute to be 'genuine', the evidence must be such that a reasonable jury could return a verdict for the nonmoving party." *Personal Touch, Inc. v. Lenox, Inc.*, 708 F.Supp. 108 (E.D.Pa.1989) (Reed, J.) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510). The *Anderson* Court explained that:

> the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary

judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 248, 106 S.Ct. at 2510 (citing 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2725, pp. 93–95 (1983)). In considering ANSAC's motion, the Court views the evidence in a light most favorable to IRM, including the benefit of all reasonable inferences. *See Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir.), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985).

IRM has urged that, in view of the novel issues of statutory interpretation, summary judgment is inappropriate on this limited record. *See* Docket No. 20 at 2–4; Docket No. 18 at 1–3 (quoting *Bingham Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984) (reversing summary judgment); *Security Pacific National Bank v. OL.s. Pacific Pride*, 549 F.Supp. 53, 55 (W.D.Wash. 1982)). The ANSAC defendants counter that summary judgment is warranted because a narrow issue controls: ANSAC's antitrust exemption for its dealings with IRM and the terminalling industry. *See* Docket No. 21 at 5 (citing *Commonwealth of Pennsylvania v. Pepsico, Inc.*, 836 F.2d 173 (3d Cir.1988)). In *Pepsico*, the Third Circuit affirmed dismissal without stipulated facts and prior to discovery where the conduct charged in the complaint was subject to a statutory antitrust exemption under the Soft Drink Interbrand Competition Act of 1980, 15 U.S.C. §§ 3501–03. *Pepsico*, 836 F.2d at 181. While acknowledging that summary judgment is disfavored where novel questions are presented, this Court concludes that a more developed record is not required in view of the Court's dispositive interpretation of ANSAC's exemption for the conduct charged by IRM. *See id.*

2. IRM has moved to strike (Docket No. 12) the affidavit of Douglass D. Gardner (Docket No. 5), pursuant to rule 56(e) on grounds including that it is not stated on personal knowledge and "that it is replete with legal conclusions, ultimate facts, conclusions without factual bases and hearsay statements." Docket No. 12 at 2. Thereafter, ANSAC filed a second Gardner affidavit (Docket No. 15) in attempt to cure the first affidavit from any defects under Rule 56(e). IRM replied to the attempts to cure the defects and renewed their objections, arguing that "the Gardner affidavit is manifestly deficient under Rule 56." Docket No. 17. Because the Court does not rely on any statements of Mr. Gardner that are not in conformity with Rule 56(e), IRM's motion will be denied as moot.

## The Scope of the Webb–Pomerene Exemption

As the Court stated in *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986), "[t]he starting point in statutory construction is, of course, the language of the statute itself." *Id.*, 106 S.Ct. at 2502. Moreover, "[a]bsent a clearly expressed legislative intention to the contrary, that [statutory] language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n. v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). *See also Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring). The statutory sections, in relevant part, provide:

§ 61. *Export trade; definitions*

The words "export trade" wherever used in sections 61 to 65 of this title mean solely trade or commerce in goods, wares, or merchandise exported, or in the course of being exported from the United States or any Territory thereof to any foreign nation; but the words "export trade" shall not be deemed to include the production, manufacture, or selling for consumption or resale, within the United States or any Territory thereof, of such goods, wares, or merchandise, or any act in the course of such production, manufacture, or selling for consumption or for resale.

The words "trade within the United States" wherever used in sections 61 to 65 of this title mean trade or commerce among the several States or in any Territory of the United States, or in the District of Columbia. or between any such Territory and another....

15 U.S.C. § 61.

§ 62. *Export trade and antitrust legislation*

Nothing contained in sections 1 to 7 [Sherman Act] of this title shall be construed as declaring to be illegal an association entered into for the sole purpose of engaging in export trade, or an agreement made or act done in the course of export trade by such association, provided such association, agreement, or act is not in restraint of trade within the United States, and is not in restraint of the export trade of any domestic competitor of such association: *Provided*, That such association does not, either in the United States or elsewhere, enter into any agreement, understanding, or conspiracy, or do any act which artificially or intentionally enhances or depresses prices within the United States of commodities of the class exported by such association, or which substantially lessens competition within the United States or otherwise restrains trade therein.

15 U.S.C. § 62.

■ The Court credits ANSAC's claim that their efforts to reduce terminalling costs fall squarely within the plain language of § 62's protection for "an agreement made or act done in the course of export trade by such association." 15 U.S.C. § 62. ANSAC's independent export of members' soda ash, including terminalling rate negotiations and shipments, is within the course of export trade. There is no dispute that these activities are in furtherance of transporting the export product to the port for loading onto ocean-going vessels bound for sales in foreign lands. The Act's definitional section also supports this interpretation, providing that "export trade" includes trade "in the course of being exported from the United States" and excludes "the production, manufacture, or selling for consumption or resale, within the United States or any Territory thereof, of such goods, wares, or merchandise, or any act in the course of such production, manufacture, or selling for consumption or for resale." *Id.* § 61.

Rather than demonstrating a clearly expressed contrary legislative intention, the history of Webb–Pomerene further supports ANSAC's position. Congress enacted the Webb–Pomerene Act in 1918 "to encourage American exports by exempting exports from constraints which placed them at a competitive disadvantage in foreign trade." *Horizons International, Inc. v. Baldrige*, 811 F.2d 154, 163 (3d Cir.1987).

In explaining the historical context of the Act, Justice White reported that:

> Congress recognized that trade in foreign nations is not ringed about with the antitrust restrictions which keep domestic industry competitive. Congress found foreign trusts to have substantial advantages over their American competitors. They can offer to extend credit and fill large orders which no single American firm could fill; they can maintain staffs to keep in touch with foreign demand more cheaply than any single American seller; and their advertising and *distribution costs* are generally lower than those of separate American firms. Having made these findings, Congress concluded that American firms should be allowed to combine to achieve lower costs, lower prices, and more comprehensive and effective service, in order to be able to compete on an equal footing for foreign shipments.

*United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 211–12, 89 S.Ct. 361, 368, 21 L.Ed.2d 344 (1968) (White, J., dissenting) (emphasis added). As Justice White's explanation shows, Congress sought to promote domestic exports by fostering more efficient economies of scale in these Webb–Pomerene associations. Achievement of lower terminalling rates, part of distribution costs, is the kind of cost-cutting measure that elevates domestic enterprises to the level of these foreign trusts. Thus, the efforts of ANSAC for which IRM seeks remedy are the kind of measures that Congress sought to foster.

The Court acknowledges that both the plain language and the history of the Act demonstrate concern about inappropriate use of the Act to restrain domestic trade. Nevertheless, these concerns are not aimed at the kind of restraint alleged here—where IRM seeks remedy for ANSAC's efforts to reduce distribution costs. Rather than protecting domestic export service

industries, the provisos of the Webb–Pomerene exemption are aimed at balancing the benefits of encouraging exports with appropriate safeguards for the American consumer. *See United States v. Concentrated Phosphates Export Ass'n*, 393 U.S. 199, 206, 89 S.Ct. 361, 366, 21 L.Ed.2d 344 (1968) ("Congress evidently made the economic judgment that joint export associations could increase American foreign trade without depriving American consumers of the main advantages of competition.").

In one of the few authoritative cases on the scope of Webb–Pomerene's antitrust exemption,[3] Judge Wyzanski, in *United States v. Minnesota Mining & Mfg. Co.*, 92 F.Supp. 947 (D.Mass.1950), construed the exemption broadly and allowed the association to continue with specified changes. *Id.* at 966. Judge Wyzanski anticipated that, by virtue of their joint efforts, a successful export company might naturally cause adverse effects on other domestic enterprises involved in exporting as well as on domestic competition generally. *Id.* at 965. Judge Wyzanski opined that, "if there are only these inevitable consequences an export association is not an unlawful restraint [because] [t]he Webb–Pomerene Act is an expression of Congressional will that such a restraint shall be permitted. *Id.*

In this action *Minnesota Mining* is persuasive in that it recognizes that certain incidental domestic restraints, such as lower costs for export services, may result from the formation of export associations pursuant to Webb–Pomerene. If ANSAC's efforts to achieve lower terminalling rates violate the Sherman Act, this must be permitted as an incidental restraint in the course of export trade. *Id.* Furthermore, these reduced terminalling costs must be permitted even if ANSAC has engaged in other conduct unprotected by the Webb–Pomerene exemption. *See id.* at 966 (export association permitted with specified changes in conduct).

---

**3.** For background and discussion of the scope of Webb–Pomerene exemption, see W.L. Fugate, The Antitrust Export Exemption: The Old Webb–Pomerene Act the New Export Trading Company Act, 15 Vand.J.Trans.L. 673 (1982) (section III considers judicial interpretation of Webb Act); 1 W.L. Fugate, Foreign Commerce and the Antitrust Laws §§ 7.1–7.19 (3d ed. 1982 & Supp.1984 & Supp.1986) (section 7.13 deals with export trade practices in general).

### Disqualifying ANSAC from Webb–Pomerene Exemption

In addition to the above discussed provisos, IRM argues that there are material factual disputes over whether ANSAC is entitled to Webb–Pomerene's protection. Specifically, IRM seeks further discovery in attempt to show that ANSAC must be disqualified from § 62's protection.

First, IRM has alleged a material factual dispute over whether ANSAC is engaged solely in the export of soda ash. IRM has suggested that ANSAC has made efforts, however veiled, to develop its own terminalling service through support of the Port of Portland terminalling project with Hall Buck Marine, Inc. *See* Docket No. 13 at 27–28; Docket No. 14, Affidavit of William P. O'Neill, Jr. at ¶¶ 22–26 ("ANSAC is *de facto* entering into the general business of terminalling services in white bulk chemical product [by long-term lease effectively underwriting project].") IRM urges that § 62's protection should be inapplicable if it shows that ANSAC's purpose has gone beyond soda ash export and now, in reality, extends to the terminalling of white bulk chemical product.

■ On its face the "sole purpose" clause is one of three types of statutory protection whereby § 62 provides Sherman Act exemptions: (1) "an association entered into for the sole purpose of engaging in export trade," (2) "an agreement made [in the course of export trade by such association]", and (3) "act done in the course of export trade by such association." 15 U.S.C. § 62. Given § 61's broad definition of "export trade," a long term lease for terminalling services—even a lease effectively financing the project—is within the course of export trade and thus within the "sole purpose" exemption of § 62. The Court concludes that a cost-cutting long term lease for terminalling services, or for any other export service, would appropriately further the goals of the Webb Act by encouraging exports. Nevertheless, if IRM were to aver that ANSAC has been directly profiting from the terminalling services of other export products, such conduct would not fall within this exemption.

■ Next, IRM urges that ANSAC cannot avail itself of Webb–Pomerene because its member organizations are owned, in part, by foreign companies. There is no support in the statutory language authorizing this Court to strip ANSAC of Webb–Pomerene protection because of foreign ownership interests in ANSAC or its members. While the legislative history demonstrates Congressional concern for aiding domestic industries in their competition in foreign markets, IRM has not shown that these concerns rise to the level of a clearly expressed legislative intention empowering courts to determine acceptable limits of foreign interests in Webb–Pomerene associations or members.[4]

---

**4.** As the Third Circuit explained in *Horizons International v. Baldrige*, 811 F.2d 154, 164 (3d Cir.1987), "[t]he Senate Report notes that the section 303(a) [Title III of the Export Trading Company Act of 1982] standards for certification are to a large extent 'a codification of court interpretations of the Webb–Pomerene exemption to antitrust law.'" 811 F.2d at 164 (quoting S.Rep. No. 27, 97th Cong., 1st Sess. 10 (1981)). So, although similar Webb Act standards are helpful in interpreting provisions of the Export Trading Company Act of 1982 ("ETCA"), it is unclear to what extent interpretations of ETCA provisions aid interpretation of Webb Act provisions. *See Horizons International, Inc.*, 811 F.2d at 164 & n. 10 (provisions of 303(a) of Title III parallel section 2 of Webb Act); W.L. Fulgate, The Export Trade Exception to the Antitrust Laws: The Old Webb–Pomerene Act and the New Export Trading Company Act, 15 Vand.J. Trans.L. 673, 673–74 (1982) (because standards similar, "precedents under the Webb Act will remain important for interpreting the new legislation."). With that caveat, the Court notes that the ETCA empowers the Secretary of Commerce, with the concurrence of the Attorney General, to promulgate regulations and issue guidelines. *See* 15 U.S.C. § 4017(a) and § 4020. As noted by a prominent commentator, under the guidelines, "[w]hile the definition of *persons* does not include foreign firms, U.S. subsidiaries of foreign companies may apply for certificates [entitling holder to ETCA exemption], and foreign companies may be members of a U.S. entity applicant." 1 W.L. Fulgate, Foreign Commerce and the Antitrust Laws § 7.20 (3d ed. 1982) (Supp.1984) (citing Dept. of Congress, International Trade Administration, Guidelines for Issuance of Export Trade Certificates of Review, Apr. 8, 1983, 48 Fed.Reg. 15, 937, *reprinted in* 44 Antitrust Trade Reg.Rep. (BNA) 816 (Apr. 14, 1983)).

Finally, IRM alleges a material factual dispute over whether ANSAC is in violation of domestic soda ash trade.[5] In support, IRM has averred, *inter alia*, that domestic prices have risen since ANSAC's formation. Given this Court's interpretation of Webb–Pomerene, this issue is not material to the dispute at hand.[6] Even if IRM could properly proceed with discovery and proof of ANSAC's conduct in restraint of domestic soda ash trade, this would not destroy ANSAC's exemption for conduct in the course of export trade. *See Minnesota Mining*, 92 F.Supp. at 966. Accordingly, this dispute is immaterial under Rule 56 because it could not affect ANSAC's entitlement to Sherman Act exemption for its dealings with IRM or the terminalling industry more generally.

*Conclusion*

In sum, the Court finds that the language of § 62 protects ANSAC's independent export of soda ash because these efforts are "in the course of export trade." 15 U.S.C. § 62. The history of Webb–Pomerene strongly supports this interpretation. Next, the Court concludes that it is not empowered to strip ANSAC of Webb–Act protection based on foreign ownership in the component membership of ANSAC. Finally, allegations of ANSAC's non-exempt antitrust violations are immaterial in that they could not affect the availability of § 62's protection for the conduct charged in the complaint. For these reasons, IRM's complaint will be dismissed pursuant to Rule 56, because the Court finds no *material* disputes and concludes that the ANSAC defendants are entitled to judgment as a matter of law.[7]

An Order reflecting this disposition follows.

ORDER

AND NOW, this 22nd day of June, 1989, upon consideration of defendants' Motion to Dismiss the Complaint (Docket No. 5), plaintiff's Motion to Strike the Affidavit of Douglas D. Gardner Pursuant to Rule 56(e), Fed.R.Civ.P. (Docket No. 12), Reply Memorandum of Plaintiff in Opposition to Defendants' Motion to Dismiss (Docket No. 13), Affidavit of William P. O'Neill, Jr. (Docket No. 14), Second Affidavit of Douglas D. Gardner (Docket No. 15), Defendants' Reply Memorandum to Plaintiff's Memorandum in Opposition to Motion to Dismiss (Docket No. 16), Plaintiff's Reply Memorandum in Support of Their Motion to Strike the Gardner Affidavit (Docket No. 17), Plaintiff's Motion to File Sur Reply Memorandum in Opposition to Defendants' Motion for Summary Judgment (Docket No. 18), Plaintiff's Pre–Argument Memorandum (Docket No. 20), Summary of Defendants' Argument Memorandum (Docket Entry No. 21), Argue Sur: Oral Argument on Defendants' Motion to Dismiss, Plaintiff's Motion to Strike (Docket Entry No. 22), Transcript of Argument re: Motions of July 19, 1988 (Docket No. 24), Plaintiff's Motion to Require Defendants to Respond to Plaintiff's Discovery and Preserve Certain Documents (Docket No. 26), and Defendants' Memorandum in Opposition to Plaintiff's Motion for an Order Compelling Discovery and Directing the Preservation of Documents (Docket No. 27), it is hereby ORDERED that:

1. The Defendants' Motion to Dismiss, treated as a motion for summary judgment, is GRANTED.

2. The Plaintiff's Motion to Strike the Gardner Affidavit is DENIED as moot.

---

**5.** Section 5 of Webb–Pomerene empowers the government to seek to enjoin any conduct of ANSAC in violation of the Sherman Act. *See United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968); *United States Alkali Export Ass'n v. United*, 325 U.S. 196, 65 S.Ct. 1120, 89 L.Ed. 1554 (1945).

**6.** The Court credits ANSAC's argument that this claim is irrelevant:

Plaintiff is not a buyer of soda ash; its claim is for injury caused by alleged fixing of rates paid for terminalling services, not for soda ash. Even if, after a long and complex trial, domestic soda ash price fixing were found to exist, it would not change the fact that the Webb–Pomerene exemption protects ANSAC's procurement of terminalling services in the course of exporting its goods overseas.

Docket No. 21 at 4.

**7.** In view of this dismissal, outstanding discovery motions will be denied as moot.

3. The Plaintiff's Motion to Require Defendants to Respond to Plaintiff's Discovery and Preserve Certain Documents is DENIED as moot.