**INTERNATIONAL RAW
MATERIALS, INC.**

v.

**STAUFFER CHEMICAL COMPANY, TG
Soda Ash, Inc., General Chemical Part-
ners, Tenneco Minerals Company, FMC
Wyoming Corp., Kerr–McGee Chemical
Corp., American Natural Soda Ash
Corp.**

Civ. A. No. 87–7541.

United States District Court,
E.D. Pennsylvania.

June 13, 1991.

David Berger (argued), H. Laddie Mon-
tague, Howard Langer (argued), Jeffrey
Rockman of Berger & Montague, P.C.,
David W. Marston of Buchanan Ingersoll,
P.C., Philadelphia, Pa., for International
Raw Materials, Ltd.

Norman H. Seidler (argued), Charles H.
Critchlow of Coudert Brothers, New York
City, for American Natural Soda Ash Corp.

Patrick W. Kittredge and Joseph M. Don-
ley of Kittredge, Donley, Fullem & Embick,
Philadelphia, Pa., for American Natural
Soda Ash Corp., General Chemical (Soda
Ash) Partners, Stauffer Chemical Co.,
Rhône–Poulenc, Inc., TG Soda Ash, Inc.
and FMC Wyoming Corp.

Edward J. Waite, III, Parsippany, N.J.,
for General Chemical (Soda Ash) Partners.

M. Mason Pattillo, Shelton, Conn., for
Rhône–Poulenc, Inc.

Eugene G. McGuire, New York City, for
TG Soda Ash, Inc.

Mark E. Ferguson of Kirkland & Ellis
and Alan R. Kidston, Chicago, Ill., for FMC
Wyoming Corp.

Stephen W. Armstrong of Montgomery,
McCracken, Walker & Rhoads, Philadel-

phia, Pa., and John M. Badger, Lakewood, Colo., for Tenneco Minerals Co.

Alfred H. Wilcox of Pepper, Hamilton & Scheetz, Philadelphia, Pa., Thomas W. Johnston of Keck, Mahin & Cate, Chicago, Ill., and Carolyn G. Hill, Oklahoma City, Okl., for Kerr–McGee Chemical Corp.

## MEMORANDUM

### LOUIS H. POLLAK, District Judge.

Defendants in this antitrust case are the nation's leading producers of soda ash. Together, they comprise the "American Natural Soda Ash Corporation" (ANSAC), an export trade association registered with the Federal Trade Commission (FTC) under the Webb–Pomerene Act, 15 U.S.C. § 61 *et seq.* Plaintiff International Raw Materials (IRM) is a Pennsylvania corporation that operates a shipping terminal in Port Longview, Washington, where it loads white dry bulk products, including soda ash, onto ocean-going vessels.

ANSAC and its members have moved for summary judgment against IRM's amended complaint, which asserts two causes of action under § 1 of the Sherman Act,[1] claiming to be exempt from ordinary application of the antitrust laws by virtue of their status as a Webb–Pomerene association. Under the Webb–Pomerene Act, "an association entered into for the sole purpose of engaging in export trade and actually engaged solely in such export trade" enjoys immunity from antitrust prosecution with respect to any "agreement made or act done in the course of export trade." 15 U.S.C. § 62. IRM denies that ANSAC qualifies for Webb–Pomerene immunity and has cross-moved for summary judgment on the basis of the virtually unrebutted substantive allegations recited in its complaint.

The central question before me, in resolving both motions for summary judgment, is whether ANSAC and its members have asserted a valid Webb–Pomerene defense.

### I.

### *Factual and Procedural Background*

This case, like an export, comes to me having had a significant history somewhere else. This case was initiated before my colleague Judge Hannum. He, and the Court of Appeals on review of his grant of summary judgment, have both previously summarized relevant issues and facts. See *International Raw Materials v. Stauffer Chemical,* 716 F.Supp. 188, 191 (E.D.Pa. 1989), *vacated and remanded,* 898 F.2d 946 (3d Cir.1990).

Formed in 1983, ANSAC is an association of American soda ash producers, registered under the Webb–Pomerene Act. All ANSAC members are United States corporations whose principal places of business are in the United States. Yet, with one exception, every member of ANSAC is wholly or partly foreign owned or has major foreign connections: (1) Defendant Stauffer Chemical Company is wholly owned by the French corporation, Rhone Poulenc Chemie S.A., the third largest producer of soda ash in the world. (2) Defendant TG Soda Ash is wholly owned by the French chemical conglomerate, Societe Nationale Elf Aquitaine, a major manufacturer of caustic soda (a soda ash substitute). (3) Defendant General Chemical Partners is forty-nine percent owned by Australian Consolidated Industries, a major re-seller of soda ash. (4) Defendant Tenneco Minerals has entered into a joint venture with Japanese-owned ASAHI Glass, the largest Japanese producer of soda ash, to exploit Tenneco Minerals' soda ash reserves. (5) Defendant Kerr–McGee recently sold its soda ash reserves to North American Chemical Company, which is thirty-percent owned by the largest Korean producer of soda ash, Oriental Chemical Industries. (6) Only defendant FMC Wyoming Corporation is not linked to a foreign enterprise significantly engaged in the production or sale of soda ash or caustic soda.[2]

---

1. Count I alleges that the members of ANSAC are engaged in horizontal price-fixing. Count II alleges that ANSAC's relationship with Hall Buck Marine Inc., the operator of a terminal

used by ANSAC, restrains trade and depresses competition in the business of terminal services.

2. Although formal discovery has not been conducted with regard to the question of foreign

Prior to formation of ANSAC, the practice in the soda ash industry was for each producer to bargain individually for terminal rates and services. ANSAC changed this practice by negotiating on behalf of all of its members and demanding a common rate. As the operator of a principal terminal, IRM bargained for rates under both regimes. Its 1985 ANSAC-negotiated rate was significantly lower than the range of rates it had managed to negotiate with individual producers between 1982 and 1984; IRM attributes this reduction to the leverage imposed by ANSAC's collective bargaining. See 898 F.2d at 947–48.

In October of 1987, ANSAC moved its business from IRM to a rival terminal, operated by Hall Buck Marine Inc. (HBM), at the Port of Portland, Oregon. Less than a month later, IRM filed a one-count complaint in this district charging ANSAC and its members with conspiring to fix and depress prices for terminal services.[3]

IRM's complaint was dismissed on summary judgment by Judge Hannum, who concluded—on the basis of the complaint, the motion for summary judgment, and the motion's supporting affidavits [4]—that ANSAC's trade practices "fall squarely within" the Webb–Pomerene exemption. 716 F.Supp. at 191. In so holding, Judge Hannum rejected IRM's contentions that AN-

SAC should be denied Webb–Pomerene status because (1) many ANSAC members are foreign owned, and (2) evidence may show that ANSAC's purpose in contracting with HBM "has gone beyond soda ash export and now, in reality, extends to the terminalling of white bulk chemical product," in contravention of the "sole purpose" clause of the Webb–Pomerene Act, see 15 U.S.C. § 62, which limits the exemption to export-related activity. *Id.* at 193.

On appeal, the Third Circuit vacated the grant of summary judgment, holding that at least one factual issue—the nature of the ANSAC–HBM relationship—required further development before ANSAC's Webb–Pomerene defense could be properly assessed:

> Appellee says that there is nothing in his relationship with Hall Buck that affects his Webb–Pomerene status and appellant says that there is. We disagree with the district court's conclusion that 'a more developed record is not required....' The district court cannot decide this issue properly until it has before it the facts as to the exact nature of that relationship.

898 F.2d at 950.

On remand, the case was reassigned to me because Judge Hannum was unwell. The parties then undertook discovery with respect to the ANSAC–HBM relationship.[5]

ownership, see note 5, *infra*, IRM has independently marshalled these facts and ANSAC acknowledged their veracity in oral argument before this court.

3. Advancing the same theory as Count I of the amended complaint, see note 1, *supra*, the original complaint alleged a cause of action under § 1 of the Sherman Act. Unlike the amended complaint (see in particular Count II), the original complaint did not specifically mention AN-SAC's as-of-then-incipient relationship with HBM. *Cf.* 716 F.Supp. at 193 (discussing AN-SAC–HBM relationship in context of original complaint).

4. The Third Circuit explained the apparent lack of discovery as follows: ANSAC first articulated its position in a motion to dismiss, which Judge Hannum treated as a motion for summary judgment (because it relied on supporting affidavits), holding that IRM was "entitled to obtain sufficient discovery to develop a material fact issue" for the purpose of responding to the motion. However,

> IRM claims that, in spite of this ruling, it was never able to obtain the information it needed because defendants continued to object to all of its discovery as overbroad and unnecessary to the disposition of their motion to dismiss; specifically, IRM was unable to obtain a copy of ANSAC's lease with Hall Buck. In January, 1989, IRM filed a motion to compel discovery. It reports that the question of discovery was raised at an untranscribed conference on April 12, and that the court deferred the issue until oral argument on the defendants' motion. The court thereafter heard oral argument on the motion to dismiss, deemed it a motion for summary judgment, granted it, and denied the motion to compel discovery as moot.

898 F.2d at 948 (citation omitted). In short, summary judgment was granted "before the plaintiff was able to conduct effective discovery." *Id.* at 947.

5. Pursuant to my Order of July 3, 1990, the scope of discovery was initially limited to the issue of the ANSAC–HBM relationship, without

The details of that relationship are now clear: On October 26, 1987, ANSAC and HBM entered into a "Terminaling Agreement" (the Agreement) under which ANSAC agreed, for an initial period of five years, to export an annual minimum of 500,000 tons of soda ash through HBM's Port of Portland terminal at a rate which was substantially lower than that which it had previously bargained for with IRM. At the close of five years, ANSAC would have the option to renew the Agreement according to the same terms.[6] If ANSAC should choose not to renew, the agreement provides as follows:

> The estimated cost of construction of the Terminal is $4,300,000. On the basis of this estimate, and an assumption that the investment cost will be amortized over fifteen (15) years, at the end of the initial five-year term of this Agreement, there will be an unamortized cost of $2,866,667. In the event that ANSAC does not renew the contract after the initial five-year term, ANSAC shall pay to Hall–Buck $1,433,333 within thirty (30) days after completion of five years of operation, regardless of the actual investment cost and unamortized cost. *ANSAC shall have the option, exercisable by written notice to Hall–Buck, to require that an economic arrangement be entered into between ANSAC and Hall–Buck providing for ANSAC's ownership, in consideration for making the above referenced payment, of 50% of the Terminal.* In such event, Hall–Buck shall be given a contract to operate the Terminal for the duration of the lease on a basis to be negotiated between both parties. *Parties agree that such 50 percent ownership interest by ANSAC is not intended to put ANSAC in the Terminalling business, but is rather intended to confer on ANSAC an appropriate equity interest in compensation for its contribution to the cost of the investment and that ANSAC shall have the right to sell, assign, or otherwise dispose of such ownership, provided however that Hall–Buck shall have the right of first refusal should ANSAC decide to sell its ownership interest.* (Emphasis added). Article 6, ¶ 7.

In other words, the Agreement provides for an ongoing commitment of capital by ANSAC to HBM, either in the form of rates paid on a guaranteed level of annual throughput or—if ANSAC elects not to renew after five years—in the form of a direct cash contribution to the terminal's unamortized costs. If ANSAC elects non-renewal, ANSAC has the further option of acquiring a fifty percent interest in the terminal.

In more general terms, the Agreement describes the relationship between the parties as follows:

> It is understood and agreed that Hall–Buck's operations hereunder are those of an independent contractor and that Hall–Buck has the authority to control and direct the performance of the details of the work hereunder, and it is further agreed that neither Hall–Buck nor any of Hall–Buck's employees are employees of ANSAC and that Hall–Buck is not, except as herein provided, subject to control by ANSAC. Article IV, ¶ 7.

Upon completion of discovery with regard to the ANSAC–HBM relationship, ANSAC and its members renewed their

---

prejudice to further discovery should it prove necessary. See transcript of telephone conference of June 26, 1990. Even though the Third Circuit had vacated Judge Hannum's grant of summary judgment in its entirety, the ANSAC–HBM relationship was the one area of factual uncertainty specifically identified by the Third Circuit as being worthy of further exploration. See 898 F.2d at 950. Upon completion of the limited discovery, ANSAC renewed its motion for summary judgment, and IRM filed its cross-motion. Thereafter, but prior to my disposition of the pending motions for summary judgment, IRM filed a motion to lift the stay on further

discovery. However, because no further discovery is necessary to effect a disposition of this case—all facts pertinent to ANSAC's Webb–Pomerene defense having been formally discovered or independently marshalled by IRM—IRM's motion for further discovery will be denied as moot in the order accompanying this memorandum.

**6.** If ANSAC agrees to renew, the Agreement provides that, upon the close of a second five-year period, ANSAC would again be entitled to renew. See Article II § 2(a).

motion for summary judgment, and IRM filed its cross-motion. Hence, the present dispute.

## II.

### Foreign Ownership of ANSAC Members

■ IRM contended before Judge Hannum, and now contends on remand, that ANSAC should be denied Webb–Pomerene status because of the substantial foreign ownership and/or control of all but one of ANSAC's members.[7] IRM submits that extensive foreign ownership or control undermines the basic purpose of the Webb–Pomerene Act—to enable American exporters to compete more effectively abroad. See, e.g., *United States v. Concentrated Phosphate Export Association*, 393 U.S. 199, 206, 89 S.Ct. 361, 365, 21 L.Ed.2d 344 (1968) ("The Webb–Pomerene Act was passed 'to aid and encourage our manufacturers and producers to extend our foreign trade.' H.R.Rep. No. 1118, 64th Cong., 1st Sess., 1 (1916). Congress felt that American firms needed the power to form joint export associations in order to compete with foreign cartels.").[8] Given what it perceives as an inconsistency between the Act's underlying purpose and ANSAC's membership structure, IRM maintains that ANSAC is not entitled to the exemption as a matter of law.

IRM's position—that an association's Webb–Pomerene status is defeated by pervasive foreign ownership or control—is not supported by any authority. The language of the Webb–Pomerene Act imposes no such qualification on membership, and there appears to be nothing in the Act's legislative history which indicates that foreign ownership or control is to be a significant factor in determining whether the exemption applies.[9] Moreover, there appears to be no judicial or administrative authority which supports the proposition that membership in a Webb–Pomerene association turns on whether (or to what extent) a corporation is foreign owned or controlled.[10]

**7.** Judge Hannum concluded that "[t]here is no support in the statutory language [or in its legislative history] authorizing this Court to strip ANSAC of Webb–Pomerene protection because of foreign ownership interests." See 716 F.Supp. at 193 & n. 4. Although IRM reiterated its position on appeal, see 898 F.2d at 949, the Third Circuit did not reach the issue of foreign ownership in vacating Judge Hannum's ruling.

**8.** As Judge Hannum observed, "Congress enacted the Webb–Pomerene Act in 1918 'to encourage American exports by exempting exports from constraints which placed them at a competitive disadvantage in foreign trade.' *Horizons International, Inc. v. Baldridge*, 811 F.2d 154, 163 (3d Cir.1987)." 716 F.Supp. at 191–92. See also *United States v. Concentrated Phosphate Export Association, supra*, 393 U.S. at 211–12, 89 S.Ct. at 368–69 (White, J., dissenting).

**9.** To the contrary, proposed amendments seeking to limit membership in a Webb–Pomerene association to corporations that are either completely or substantially American owned were considered and rejected by Congress. See CONG.REC. 13730–31 (1916).

**10.** To support its argument, IRM relies on several FTC decisions, each recognizing a form of activity undertaken by a Webb–Pomerene association in conjunction with a foreign enterprise to be unprotected by the Act. See IRM's brief at 55–57. However, all of these decisions involve forms of activity not at issue in this case; none of them suggests that there is anything contrary to the Act where, as here, the association—though comprised in part of foreign subsidiaries—has done nothing more than to bargain and contract for domestic terminal services in furtherance of its export trade.

Thus, although the FTC held in *In re Phosphate Export Association*, 42 F.T.C. 555 (1946)—a case, which counsel for IRM stated in oral argument to be the case most pertinent to the instant dispute—that "[i]t was not consistent with the terms and purposes of the Webb–Pomerene Act for [an association] to accept as a member the subsidiary of a foreign purchaser or potential customer of phosphate," what was dispositive in the view of the FTC was the fact that the member in question, which happened to be a subsidiary of a foreign corporation, "was never itself a producer of phosphate rock.... [nor] actually engaged in the exportation of phosphate from this country.... [Its] participation ... was an activity in the course of the import trade into Europe rather than in the course of export trade from the United States." *Id.* at 843–44. See also *In re General Milk Co.*, 44 F.T.C. 1355, 1411 (1947) ("The Commission is unwilling to place the stamp of administrative approval upon the association's ownership of foreign subsidiaries which are not engaged in any respect in the exportation of milk products from the United States."); *United States v. Minnesota Mining and Manufacturing Co.*, 92 F.Supp. 947, 963 (D.C.Mass.1950) ("And unlike a

Nor does it follow by simple syllogism that foreign ownership is necessarily at odds with the design of the Webb–Pomerene Act to confer domestic benefits: by virtue of the exemption the Act provides, American producers, workers, and raw materials encounter fewer competitive obstacles and thereby command easier access to international markets than would be the case if they were afforded no antitrust immunity. In other words, an export exemption can advance American interests, even though various exporters may be foreign owned or controlled. Of course, it can be plausibly argued that the privilege of antitrust exemption should only be extended to export enterprises most or all of which are not subject to foreign control. However, it is up to Congress, not this court, to fashion the nation's trade policies within the broad limits set by the Constitution's commerce clause.

Accordingly, I conclude that ANSAC's Webb–Pomerene status is not diminished by the circumstance that most ANSAC members are foreign owned or controlled.

## III.

### The ANSAC–HBM Relationship

■ IRM also contends that ANSAC should be denied immunity because its relationship with HBM is not for the "sole purpose" of export trade and thus exceeds the scope of the Webb–Pomerene exemption. See 15 U.S.C. § 62. Advancing the same argument it made before Judge Hannum, this time equipped with evidence obtained through discovery and with an affidavit by an expert, Professor Herbert R. Northrup, who has analyzed that evidence and endeavored to spell out its economic implications, IRM submits that the ANSAC–HBM Agreement, and the relationship it entails, have effectively made ANSAC a participant in the general business of terminalling, in addition to its being a participant in the business of export trade.

IRM's position that the ANSAC–HBM relationship is not confined to export trade rests on a number of related claims: *First,* IRM claims that construction of HBM's Port of Portland Terminal would not have been completed but for ANSAC's annual guarantee of a minimum of 500,000 metric tons of soda ash throughput, as provided in the ANSAC–HBM Agreement. According to IRM, this guarantee made the terminal "bankable;" it created a solid business base for obtaining further financing. *Second,* IRM claims that HBM arranged, in return for ANSAC's guarantee, to have ANSAC's rate for terminal services subsidized by other terminal users. That is, ANSAC's relatively lower rate is said to be the result of correspondingly higher rates charged other terminal users.[11] In this way, IRM submits, ANSAC profits from the general business of the terminal. *Third,* ANSAC's future prospect of becoming (if it so chooses) a fifty percent owner of HBM's terminal, as contemplated by the renewal-default provision recited in the ANSAC–HBM Agreement, creates for ANSAC a present economic interest in the general business and overall prosperity of the terminal.[12]

---

combination of producers to unite in exporting to foreign countries, a combination of producers to unite in manufacturing in foreign countries has not the benefit of the statutory immunity of the Webb–Pomerene or any other Act of Congress.").

**11.** Here, IRM relies primarily on the deposition testimony of John William Reinacher, Director of Distribution of ANSAC, who explained, interpreting notes from a May 1987 ANSAC–HBM meeting, that

my understanding was that they were offering us a base load contract for our commitment which would give them the ability to go forward with construction, and that they would then solicit other products and other non-AN-

SAC soda ash business at higher levels than what they were offering us as a base load commitment.
See Reinacher Deposition at 56–57, Exhibit "F" to Northrup Affidavit.

**12.** Professor Northrup states in his affidavit, ¶ 9:

ANSAC's economic interest in the Port of Portland terminal is clearly evidenced by the terms of the agreement of October 26, 1987, between HBM and ANSAC. These terms include a commitment by ANSAC to pay for unamortized construction costs of the terminal in the case of contract non-renewal and the concomitant fifty percent ownership position that would be conferred upon ANSAC as a result. The economic interest is also evi-

Yet, none of these allegations can sustain the claim that ANSAC has made any agreement or done any act which exceeds the scope of the protection provided by the Webb–Pomerene Act for "agreement[s] made or act[s] done *in the course of export trade.*" 15 U.S.C. § 62 (emphasis added). There is no feature of the ANSAC–HBM relationship that goes so far as to make ANSAC a direct participant, investor, or privileged beneficiary in HBM's terminal operations. That ANSAC's annual guarantee was the *sine qua non* of HBM's Port of Portland terminal, effectively underwriting the completion of construction, does not tend to establish that ANSAC was undertaking to advance any interest beyond that of securing a viable and efficient terminal for loading and throughputting its exports. Similarly, there is nothing to indicate that the lower rate received by ANSAC, even if subsidized to some degree by higher rates charged other terminal users, serves any purpose other than to enhance the capacity of ANSAC members to compete effectively in world markets.[13]

Finally, the fact that ANSAC maintains an option, exercisable upon the close of the initial five-year period, to acquire fifty percent of the equity in HBM's terminal, does not add any meat to the theory that ANSAC has entered the general business of terminalling. ANSAC currently maintains no equity share in the terminal, and it is not clear that it will exercise its option and procure an equity share in the future. Thus, as things now stand, ANSAC's joint-ownership of HBM's terminal is a possibility, not a reality. Furthermore, ANSAC's future prospect of co-owning the terminal does not create for it a present economic stake in the general operations of the terminal different from that of any other terminal user; all users of HBM's terminal have an interest in the terminal's overall success and prosperity insofar as their business depends on it.

In short, even though it is not inconceivable that ANSAC may one day enter a relationship with HBM that would jeopardize its Webb–Pomerene status, that point has not been reached as of yet. The evidence of record, though providing a full view of the ANSAC–HBM relationship, cannot be construed as suggesting that ANSAC's current relationship with HBM at the Port of Portland terminal in any way exceeds the scope of activity permitted by the Webb–Pomerene Act as activity done "in the course of export trade."

It may be true, as IRM points out, that ANSAC receives a number of indirect economic benefits through its relationship with HBM at the Port of Portland terminal. And it may be true that the ANSAC–HBM relationship generates a number of adverse collateral effects, such as higher rates charged other terminal users and lower use of competing terminals by association members.[14] However, these effects are not a basis for stripping ANSAC of its Webb–Pomerene status; rather, they are the "inevitable consequences" of legislation designed to promote American export trade at the risk of inducing and enduring some

---

denced by ANSAC's dual role as facilitator of the terminal's construction and benefactor of its operation. Because of its economic interest in the bulk outloading terminal, ANSAC is in fact participating in the business of terminalling not only soda ash, but also other products ...

**13.** There is no reason to suspect that ANSAC's low rate is anything more than a volume discount, such as would be provided to any other large customer. The rate does not function as a profit-share in that it does not vary depending on the terminal's overall success.

**14.** To the extent that IRM's antitrust claims are predicated on the allegation (or, at least, the implication) that ANSAC's anti-competitive practices have had and continue to have an adverse

and impermissible impact on the domestic soda ash industry, unrelated to and not excused by ANSAC's export activity, see 15 U.S.C. § 62 (Webb–Pomerene association may not "enter into any agreement ... or do any act which artificially or intentionally enhances or depresses prices within the United States of commodities of the class exported by such association, or which substantially lessens competition within the United States or otherwise restrains trade therein."), I conclude that IRM—as neither a consumer or producer of soda ash—has no standing to assert such claims. For the same reason, I conclude that IRM is not entitled to discovery to explore alleged collusive activity by ANSAC directed at domestic competition within the soda ash industry. Cf. note 5, *supra* (explaining limitations imposed on discovery in the course of this litigation).

**694**

anti-competitive practices. See *United States v. Minnesota Mining and Manufacturing Co., supra*, 92 F.Supp. at 965.[15]

ANSAC's relationship with HBM, albeit complex, and though certainly involving more than a standard stevedoring agreement to have HBM's terminal load ANSAC's products, still fits wholly within the bounds of the antitrust exemption provided by the Webb–Pomerene Act for the purpose of promoting American export trade.[16]

## IV.

### Conclusion

Pursuant to the remand directed by the Court of Appeals, sufficient discovery has now been completed to reach summary judgment on ANSAC's Webb–Pomerene defense, which, if sustained, is an absolute defense to the antitrust causes of action recited in IRM's amended complaint. For the reasons discussed above, I conclude that ANSAC qualifies for the exemption provided by the Webb–Pomerene Act and has therefore asserted a valid Webb–Pomerene defense. Accordingly, in the Order accompanying this memorandum, I will grant ANSAC's motion for summary judgment and deny IRM's cross-motion for summary judgment.

---

**15.** In *Minnesota Mining*, Judge Wyzanski stated in pertinent part: "Now it may very well be that every successful export company does inevitably affect adversely the foreign commerce of those not in the joint enterprise and does bring the members of the enterprise so closely together as to affect adversely the members' competition in domestic commerce. Thus every export company may be a restraint. But if there are only these inevitable consequences an export association is not an unlawful restraint. The Webb–Pomerene Act is an expression of Congressional will that such a restraint shall be permitted. And the courts are required to give as ungrudging support to the policy of the Webb–Pomerene as to the policy of the Sherman Act. Statutory eclecticism is not a proper judicial function." 92 F.Supp. at 965.

**16.** Thus, although the FTC has rejected as inconsistent with the Act those arrangements in which an association has in the course of its activity colluded with non-members, participated in foreign manufacture, impeded the flow of imports, or denied terminal access to competitors, see *supra* note 10; cf. *In re Florida Hard Rock Phosphate Export Association*, 40 F.T.C. 843, 860–61 (1945) (Webb–Pomerene Act does not permit association to exercise its control of a terminal by excluding non-association members); *In re Export Screw Association of the United States*, 43 F.T.C. 980 (1947) (Webb–Pomerene Act does not permit association to include non-members in price-fixing or to restrain foreign imports); *In re Sulphur Export Corp.*, 43 F.T.C. 820 (1947) (Webb–Pomerene Act does not permit association to collude with non-members to restrict imports), I am aware of no instance in which the FTC or any other administrative authority or court has thought it necessary to preclude a Webb–Pomerene association from contracting to procure the services of a more cost-effective terminal as a means of enhancing its export trade.