OPINION OF THE COURT
BECKER, Circuit Judge.
This appeal presents a question of antitrust immunity under the Webb-Pomerene Act, 15 USC §§ 61-65 (1988). Plaintiff International Raw Materials (“IRM”), a marine terminal operator, appeals from an order of the district court for the Eastern District of Pennsylvania granting, for the second time, summary judgment against the plaintiff in its antitrust suit against an association of soda ash producers and its members. The district court held that the association and its members were exempt from liability by virtue of the association’s status as an export trade association registered with the Federal Trade Commission pursuant to the Webb-Pomerene Act. Under that Act, “an association entered into for the sole purpose of engaging in export trade and actually engaged solely in such export trade” enjoys immunity from the antitrust laws with respect to any “agreement made or act done in the course of export trade.” 15 USC § 62 (1988).
IRM’s position in the case is that the association has forfeited that immunity because it has (1) included foreign-owned corporations as members; (2) conspired with non-exempt foreign soda ash producers to depress competition in the soda ash industry; and (3) pursued purposes other than export trade by entering into a terminalling agreement with one of IRM’s rival terminal operators. In addition, IRM contends that summary judgment was inappropriate because the novel questions of law presented by this case should not have been decided without the benefit of a fully developed factual record.
We conclude that immunity under the Act is not limited to associations composed solely of American-owned firms; that IRM lacks standing to argue that the association has forfeited the exemption by depressing competition in the market for soda ash; and that the association did not forfeit its right to the exemption by entering into the terminalling agreement. We also conclude that further factual development is not necessary to decide the questions of law presented, although they are admittedly both novel and complex. Accordingly, we will affirm the district court's grant of summary judgment for defendants.
*1320 I. FACTS
IRM operates a terminal in Port Long-view, Washington, where it loads dry white bulk product, primarily soda ash,[1] onto ocean-going vessels. Formed in 1983, the American National Soda Ash Corporation (“ANSAC”) is an association of soda ash producers organized pursuant to the Webb-Pomerene Act. Although all of its members are United States corporations whose principal places of business are in the United States, all but one is partly or wholly owned by, or affiliated with, a major foreign corporation.[2]
Prior to ANSAC’s formation, each soda ash producer bargained separately for terminal services. Once ANSAC was formed, however, each member ceased individual bargaining and instead authorized ANSAC to negotiate a common rate on behalf of them all.[3] IRM bargained for rates under both regimes.
Other terminal operators also bargained for rates with ANSAC. In early 1984, Hall-Buck Marine, Inc. (“Hall-Buck” or “HBM”), a terminal operator in competition with IRM, proposed an arrangement whereby ANSAC would guarantee to ship 400,000 metric tons of soda ash each year for five years, in return for which ANSAC would receive lower rates and would share in revenues for all soda ash cargoes shipped by other firms. ANSAC did not accept Hall-Buck’s proposal.
In September 1985, ANSAC entered into a three-year agreement with IRM in which ANSAC agreed to use IRM’s Longview facility to load at least 66 percent of AN-SAC's West Coast exports. At $3.72 to $4.72 per metric ton, the collective rates ANSAC and IRM agreed to were significantly lower than the range of rates IRM had negotiated with the individual producers between 1982 and 1984.[4]
As their agreement neared expiration, ANSAC and IRM resumed negotiations. Although IRM offered ANSAC a flat rate of $3.72 per metric ton, ANSAC took its business to Hall-Buck, which had signed a lease with the Port of Portland, Oregon and planned to construct a new terminal there. On October 30, 1987, ANSAC and Hall-Buck entered into a Terminalling Agreement in which Hall-Buck promised ANSAC rates substantially lower than those ANSAC had previously negotiated with IRM.[5] In return, ANSAC promised to ship at least 500,000 metric tons of soda ash through Hall-Buck’s Portland terminal each year, unless Hall-Buck obtained more than 250,000 tons of business from customers other than ANSAC, in which case AN-SAC’s annual commitment would be reduced to 425,000 tons.
*1321 The ANSAC/Hall-Buek agreement provides for a term of five years, with two five-year options to renew. More specifically, the Agreement entitles ANSAC to renew on the same terms at the end of the first five years. If ANSAC exercises its option to renew, the Agreement also entitles it to renew on the same terms at the end of the next five years. If ANSAC chooses not to renew at the end of the first five years, the Agreement requires ANSAC to pay Hall-Buck half of the estimated unamortized cost of constructing the terminal within thirty days after the end of the five-year term. Payment of this amount gives ANSAC “the right to require” a 50 percent ownership interest in the terminal.[6] The Agreement further provides:
In such event, Hall-Buck shall be given a contract to operate the Terminal for the duration of the lease on a basis to be negotiated between both parties. Parties agree that such 50 percent ownership interest by ANSAC is not intended to put ANSAC in the Terminalling business, but is rather intended to confer on ANSAC an appropriate equity interest in compensation for its contribution to the cost of the investment and that ANSAC shall have the right to sell, assign, or otherwise dispose of such ownership, provided however that Hall-Buck shall have the right of first refusal should ANSAC decide to sell its ownership interest.
IRM III, 767 F.Supp. at 690.
II. PROCEDURAL HISTORY
IRM filed this suit on November 23, 1987, less than one month after it lost ANSAC’s business to Hall-Buck. IRM’s initial complaint alleged that ANSAC and its members conspired to fix the rates of domestic terminalling services for soda ash in violation of section 1 of the Sherman Act, 15 USC §§ 1-7 (1988). On January 11, 1989, defendants moved for dismissal under Federal Rule of Civil Procedure 12(b)(6), claiming that, as a matter of law, their status as a Webb-Pomerene association exempted them from antitrust liability.
In response, IRM argued that ANSAC does not qualify for Webb-Pomerene status because (1) many ANSAC members are owned by foreign corporations and (2) further discovery might reveal that, through its relationship with Hall-Buck, ANSAC was actively engaging in the terminalling business, thereby violating the “sole purpose” provision of the Act, which restricts the exemption to export-related activity. See 15 USC § 62.
Because the district court considered the affidavits supporting the defendants’ 12(b)(6) motion, it treated that motion as one for summary judgment under Federal Rule of Civil Procedure 56. International Raw Materials, Ltd. v. Stauffer Chemical Co., 716 F.Supp. 188, 190 (E.D.Pa.1989) (“IRM II”), vacated, 898 F.2d 946 (3d Cir1990) (“IRM II”). Concluding that AN-SAC’s practices “fall squarely within” the Webb-Pomerene exemption, 716 F.Supp. at 191, the court granted summary judgment for the defendants. IRM appealed.
Although IRM had argued before the district court that ANSAC’s relationship with Hall-Buck was such that ANSAC was no longer entitled to immunity under the Webb-Pomerene Act, little, if any discovery, had been conducted on the facts of that relationship. We held that it was necessary to develop a more complete factual record before we could determine the applicability of the Webb-Pomerene exemption. See 898 F.2d at 949-50. Accordingly, we *1322 vacated the grant of summary judgment and remanded to the district court for further fact finding.
On remand, the district court limited discovery to the issue of the relationship between ANSAC and Hall-Buck.[7] Upon completion of discovery as to that issue, the parties renewed their cross-motions for summary judgment. While those motions were pending, IRM amended its complaint to add six foreign corporations and Hall-Buck as alleged co-conspirators with AN-SAC and its members. The amended complaint also added a second count, alleging that ANSAC’s relationship with Hall-Buck violated section 1 of the Sherman Act by restraining trade and depressing competition in the business of terminal services.
Before the district court’s disposition of the pending motions, IRM also moved to lift the limitation on further discovery. In an order accompanying its opinion on the summary judgment motions, the district court denied the motion for additional discovery because “no further discovery is necessary to effect a disposition of this case — all facts pertinent to ANSAC’s Webb-Pomerene defense having been formally discovered or independently mar-shalled by IRM.” IRM III, 767 F.Supp. at 689-90 n. 5.
IRM opposed ANSAC’s motion for summary judgment on the same two grounds it had raised before. However, the district court rejected both challenges, reasoning that (1) neither the plain language of the statute nor its legislative history prevent foreign-owned firms from participating in Webb-Pomerene associations and (2) AN-SAC’s relationship with Hall-Buck did not put ANSAC into the terminalling business.
This appeal followed. We have appellate jurisdiction pursuant to 28 USC § 1291.[8] Our review of an order granting summary judgment is plenary, Desvi, Inc. v. Continental Ins. Co., 968 F.2d 307, 308 (3d Cir.1992), and we view the facts in the light most favorable to IRM, the party opposing summary judgment, Erie Telecommunications, Inc. v. Erie, 853 F.2d 1084, 1093 (3d Cir.1988).
III. DISCUSSION
A. The Webb-Pomerene Act — General Background
In 1916, the Federal Trade Commission submitted to Congress an exhaustive study of the United States export trade. See generally Federal Trade Commission, Report on Cooperation in American Export Trade (1916). In that study, the Commission expressed concern that United States exporters, particularly small manufacturers and producers, were at a disadvantage vis-a-vis foreign cartels. Id. at 6. Consequently, the Commission recommended that United States firms be permitted to form their own export cartels free of the strictures of the Sherman Act. Id. at 3.
In 1918, Congress passed the Webb-Pomerene Act, thereby creating an exemption to the Sherman Act for all cartels or combinations engaged solely in export trade. Congress enacted Webb-Pomerene because it agreed with the Commission’s proposed solution to the perceived problems facing United States exporters. See United States v. Concentrated Phosphate Export Ass’n, 393 U.S. 199, 206, 89 S.Ct. 361, 365-66, 21 L.Ed.2d 344 (1968) (“Concentrated Phosphate ”) (“Congress felt that American firms needed the power to form joint export associations in order to compete with foreign cartels”). See also Note, The Webb-Pomerene Act: A Reexamination of Export Cartels in World Trade, 19 Va J Inti L 151, 156 (1978) (Congress “sought to enable American exporters to compete effectively with the bargaining strength of foreign cartels” by allowing American firms to join forces). Proponents of the FTC’s position envisioned several ways in which allowing United States exporters to collude would help them to compete with foreign suppliers. For example, Representative Webb noted that firms could reduce marketing costs by creating *1323 joint selling agencies. 55 Cong Ree 3576 (1917).
At the same time that Congress wanted to encourage exports, however, it also wanted to ensure that gains in export trade did not come at the expense of the American consumer. Congress “thought it could increase American exports by depriving foreigners of the benefits of competition among American firms, without in any significant way injuring American consumers.” Concentrated Phosphate, 393 U.S. at 208, 89 S.Ct. at 366. Congress therefore hedged the exemption with a number of provisos intended to preserve competition in the domestic market. 393 U.S. at 206-07, 89 S.Ct. at 366.
The statute’s language reflects Congress’s dual (and arguably contradictory) goals. Specifically, the Webb-Pomerene Act provides:
Nothing contained in [the Sherman Act] shall be construed as declaring to be illegal an association entered into for the sole purpose of engaging in export trade and actually engaged solely in such export trade, or an., agreement made or done in the course of export trade by such association, provided such association, agreement, or act is not in restraint of trade within the United States, and is not in restraint of the export trade of any domestic competitor of such association: Provided, That such association does not, either in the United States or elsewhere, enter into any agreement, understanding, or conspiracy, or do any act which artificially or intentionally enhances or depresses prices within the United States of commodities of the class exported by such association, or which substantially lessens competition within the United States or otherwise restrains trade therein.
15 USC § 62 (1988) (emphasis in original). In sum, the Act permits Webb-Pomerene associations to form export cartels without fear of suit under the Sherman Act, provided that they do not restrain domestic trade in the good or product they export, or hinder the export trade of domestic competitors that are not members of the association. See Wilbur L. Fugate, The Export Trade Exception to the Antitrust Laws: The Old Webb-Pomerene Act and the New Export Trading Company Act, 15 Vand J Trans L 673, 677 (1982).
B. The Effect of Foreign Ownership on an Association’s Immunity Under the Webb-Pomerene Act
1. Statutory Construction
Nothing in the language of the statute or its legislative history explicitly restricts membership in’ Webb-Pomerene associations to American-owned firms. Indeed, the House of Representatives considered and rejected statutory language to that effect. During the debate in the House, Representative Dillon proposed amending the bill to read “associations formed under the terms of this act shall be composed solely of citizens or corporations of the United States.” During the discussion of the proposed amendment, Representative Bennett suggested limiting the Act’s immunity to corporations that had at least 60 percent American ownership. Cong Rec 13730-31 (1916). Neither the amendment nor the suggestion was adopted. Id. at 13731.
IRM argues that wé should disregard the rejection of these efforts to limit Webb-Pomerene associations to American-owned firms because Representative Dillon was an opponent of the Act who offered his amendment at the eleventh hour. IRM further observes that the amendment received little debate, and was rejected because some were concerned that it would prevent the associations from employing a foreign selling agent, and others thought that it was poorly drafted. IRM may well be correct in its analysis of the circumstances surrounding the amendment and the reasons for its rejection. Nevertheless, the fact remains that nothing in the statute’s language prevents United States subsidiaries of foreign corporations from participating in a Webb-Pomerene association.
IRM also argues that the amendment was rejected because Congress thought that a prohibition against foreign ownership was already contained in the Act. In *1324 support of this argument, IRM cites to the following statement made by Senator Pom-erene approximately a year after the proposed amendment:
On the second page of the bill the committee defines the associations which may have the privileges of the bill as meaning “any corporation or combination, by contract or otherwise, of two or more persons, partnerships, or corporations.” I think the language is so explicit that whatever organization is formed will be so subject to the laws of the land that it would be impossible for foreigners to engage in this business and continue the association in violation of the laws of the United States.
But I want to suggest, for the consideration of Senators at this time, that if they have any doubt about this language it could be amended by providing that these associations would be composed only of two or more persons, partnerships, or corporations who are resident in or situate within the United States. Such an amendment would prevent absolutely any foreign corporation or cartel from becoming interested in the association. I do not believe it is necessary, but it may be that it would be a wise additional safeguard.
56 Cong Rec 169 (1917).
IRM interprets Senator Pomerene’s statement to mean that a prohibition against foreign firms was already “so explicit” in the bill as drafted. In response, ANSAC points out that, in the quoted passages, Senator Pomerene was discussing the bill’s provisos against injury to domestic trade. In ANSAC’s view, Senator Pom-erene was simply stating that in his opinion, the bill already contained adequate safeguards against unlawful foreign influences that might cause such an injury.
We agree. We do not read Senator Pom-erene’s statement as evidence of congressional intent to limit membership in Webb-Pomerene associations to American-owned firms. First, his statement was made in response to another concern — he was replying to critics of the bill who feared its effects on the domestic market and on the export trade of domestic competitors of the associations. 56 Cong Rec at 169. Immediately before he made the statement quoted above, he stressed that the bill’s immunity extended only to “trade or commerce ... exported or in the course of being exported from the United States ... to any foreign nation,” id, thereby underscoring that the immunity did not extend to trade within the United States. Then, after stating that “it would be impossible for foreigners to engage in this business and continue the association in violation of the laws of the United States,” id. (emphasis added), he emphasized that the bill contained provisos against injury to the domestic market and to the export trade of domestic competitors. Accordingly, we interpret his statement as an effort to reassure opponents that foreign firms could not use the bill’s immunity to do damage to the domestic market or to the export trade of domestic competitors, rather than as a prohibition against permitting foreign-owned firms to participate in the associations.
In addition, we note that the change Senator Pomerene suggested would not have prohibited foreign-owned firms from joining Webb-Pomerene associations. Rather than proposing an amendment limiting membership to American-owned firms, Senator Pomerene instead suggested changing the language to read “these associations would be composed only of two or more persons, partnerships, or corporations who are resident in or situate within the United States,” id. (emphasis added). This suggested language says nothing about the ownership of the association’s members. Moreover, the suggested language is consistent with our interpretation of the motivation behind Senator Pomerene’s statement. Because firms that are resident or situated in the United States export from the United States to a foreign nation, limiting membership to such firms is another way of saying that the immunity extends only to the export trade.
Having determined that neither the statute nor the legislative history specifically resolves the question of whether membership in a Webb-Pomerene association is limited to American-owned firms, we con *1325 sider whether permitting foreign-owned firms that export goods from the United States to participate in such associations is inconsistent with the purpose of the Act.
As we have noted, “[t]he Webb-Pomer-ene Act was passed to allow United States companies exporting United States products to compete more effectively in the world market.” IRM II, 898 F.2d at 947, citing HR Rep No. 1056, 64th Cong, 2d Sess 1-2 (1917); S Rep No. 1118, 64th Cong, 1st Sess 1 (1916). In other words, the purpose of the Act is to increase exports from the United States. Permitting foreign-owned firms that produce goods in the United States for export to other countries to participate in Webb-Pomerene associations does not militate against this purpose.
IRM submits that because Congress intended the increase in exports to inure to the benefit of “American interests,” only American-owned firms should be permitted to claim the Act’s protections. While it could be argued that Congress intended the Act to protect only those firms that are American-owned or “American-controlled”, we are reluctant to read such a requirement into the statute, especially when, as Judge Poliak observed, foreign ownership is not necessarily at odds with an intent to benefit American interests. See IRM III, 767 F.Supp. at 692. Foreign-owned firms that produce goods in the United States for export to other countries employ American workers, purchase American services and raw materials, and pay American taxes.
Congress may not have had these particular benefits in mind when it passed the Webb-Pomerene Act. But where, as here, an argument can be made that allowing foreign-owned firms to claim the exemption is consistent with the purpose of the Act, and where Congress did consider excluding such firms, but chose not to, we will not read into the Act an intention to limit participation to American-owned firms.[9]
2. Case Law
This is the first reported case in which the Webb-Pomerene Act has been asserted as a defense to a private civil suit. Prior cases consist of government enforcement actions against Webb-Pomerene associations. IRM looks to the case law to support its argument that foreign ownership is inconsistent with the purpose of the Act. However, none of the cases addressed the question presented here — whether the Act applies to foreign-owned firms that produce goods in the United States for export to other countries. Although they are therefore inapposite, we review them briefly because they are all that is out there *1326 with respect to this almost three-quarter-century-old law.
In In re Phosphate Export Ass’n, 42 FTC 555 (1946), the FTC prohibited a foreign-owned corporation from participating in a Webb-Pomerene, association. The Commission held that “[i]t was not consistent with the terms and purposes of the Webb-Pomerene Act for [an association] to accept as a member the subsidiary of a foreign purchaser or customer” of the association’s product, id. at 843-44 (emphasis added). The Commission’s decision did not, however, depend upon the fact that the subsidiary was owned by a foreign parent; instead, the Commission observed that the subsidiary “was never itself a producer of [the product] ... [nor] actually engaged in the exportation of [the product] from this country.” Id. Because the subsidiary’s “participation ... was an activity in the course of export trade into Europe rather than in the course of export trade from the United States,” id., its activities did not fall within the scope of the Act as defined by the plain language of the statute. See 15 USC § 61 (defining “export trade” as “trade or commerce in goods ... exported ... from the United States”).
Another case cited by IRM, United States v. Minnesota Mining & Mfg. Co., 92 F.Supp. 947 (D Mass 1950), was decided on similar grounds. In that case, a Webb-Pomerene association composed of firms that manufactured coated abrasives in the United States formed jointly-owned foreign subsidiaries to manufacture the same products abroad. They agreed not to export their American-made products, but instead to supply foreign markets with goods produced by their foreign subsidiaries. The court held that the immunity conferred by the Webb-Pomerene Act did not apply to that agreement. By agreeing to supply foreign markets with goods produced abroad, the association increased “the exclusively internal trade of a foreign country.” Id. at 963. Because the “statute is by its first section limited to that sort of ‘export trade’ which Consists of ‘commerce in goods ... exported ... from the United States ... to any foreign nation,’ ” id. at 963, the immunity conferred by the Act did not apply to the agreement. See also In re General Milk Co., 44 FTC 1355, 1411 (1947) (immunity does not cover member’s foreign subsidiaries that are not engaged in exporting product from the United States).
In sum, these cases stand for the proposition that Webb-Pomerene immunity is limited to the business of exporting goods from the United States. Because foreign corporations that do not produce goods in the United States do not engage in that business, Phosphate held that they may not be included as members of Webb-Pom-erene associations. Correlatively, Minnesota Mining held that a Webb-Pomeréne association’s immunity does not extend to production abroad by subsidiaries of the association’s members because such production is not part of the business of exporting goods from the United States. This case is distinguishable from Phosphate and Minnesota Mining because all of ANSAC’s members produce goods for export from the United States and thus all engage in “export trade” as it is defined by the statute.
C. The Alleged Conspiracy with Non-immune Parties
IRM also argues that ANSAC has forfeited its immunity under the WebbPomerene Act by conspiring with the foreign parent corporations of its members. This argument is grounded on United States v. United States Alkali Export Ass’n, 86 F.Supp. 59 (S.D.N.Y.1949) ("Alkali"), which prohibited Webb-Pomerene associations from conspiring with foreign producers of the same product. There, two Webb-Pomerene associations that were formed for the purpose of selling their members’ products abroad entered into agreements with firms that produced the same products in other countries. Under those agreements, the associations agreed to divide the worldwide market into territories (some exclusive and some joint), establish sales quotas, and fix prices in foreign markets. The court rejected the associations’ Webb-Pomerene defense because it reasoned that agreements to cartelize the *1327 international market necessarily restrain the export trade of domestic competitors, thereby violating the statute’s provisos. Id at 67.
IRM argues that Alkali is on point because ANSAC’s foreign-owned members are, in effect, controlled by foreign producers of soda ash. According to IRM, the foreign soda ash producers are using their subsidiaries as front companies through which to achieve the very type of international cartelization prohibited in Alkali. We are unpersuaded.
Even if we adopt IRM’s allegations as true, the harm to domestic competition caused by international cartelization of the soda ash industry is irrelevant to IRM’s suit. Such harm falls on producers or purchasers of soda ash. In contrast, IRM is a terminal operator, and the harm its suit alleges is that ANSAC has depressed competition in the market for terminalling services. If IRM had alleged that it purchases or sells soda ash, it would have standing to assert a claim that it has been injured by ANSAC’s alleged restraint of trade in the soda ash market.[10] See generally Associated Gen. Contractors, Inc. v. California State Council of Carpenters, 459 U.S. 519, 539, 103 S.Ct. 897, 909, 74 L.Ed.2d 723 (1983). Although IRM has asserted that ANSAC’s activities have decreased competition in the terminalling market, it has simply offered no basis for this assertion. Given that IRM has failed to develop a claim that ANSAC’s alleged restraint of trade in the soda ash market has resulted in decreased competition in the terminalling market, we hold that it may not rely on ANSAC’s alleged unlawful conduct in the soda ash market as the basis for its challenge to ANSAC’s immunity for activities in the terminalling market.[11]
It is well established that, notwithstanding the broad literal language of the Sherman Act, Congress did not intend to allow everyone affected by an antitrust infraction to bring suit. See, for example, Associated Gen. Contractors, 459 U.S. at 529-536, 103 S.Ct. at 903-907; Blue Shield of Va. v. McCready, 457 U.S. 465, 477, 102 S.Ct. 2540, 2547, 73 L.Ed.2d 149 (1982) (“Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action for threefold damages”). The Court has imposed limitations on who may sue under the antitrust laws. Under the rule of Brunswick Corp v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d *1328 701 (1977), a plaintiff must demonstrate that it has suffered antitrust injury in order to sue under the antitrust laws.[12] Brunswick holds that to establish antitrust injury, plaintiffs must prove (1) “injury of the type the antitrust laws were intended to prevent,” id at 489, 97 S.Ct. at 697, and (2) injury that “flows from that which makes the defendants’ acts unlawful,” id at 489, 97 S.Ct. at 697.
In Brunswick itself, and typically in decisions in which antitrust injury was found lacking, the plaintiffs failed to satisfy the first prong of Brunswick’s test because they were injured by acts that were actually procompetitive. See id. at 487, 97 S.Ct. at 697; Cargill Inc. v. Monfort of Colo., Inc. 479 U.S. 104, 115-17, 107 S.Ct. 484, 492-93, 93 L.Ed.2d 427 (1986); Schoenkopf v. Brown & Williamson Tobacco Corp., 637 F.2d 205, 211 (3d Cir.1980). In contrast, IRM has satisfied Brunswick’s first requirement. Its allegation of decreased competition in the terminalling market is the type of harm targeted by the antitrust laws.
Brunswick’s second prong is where IRM falters. IRM bases its claim upon the alleged cartelization of the international soda ash market, even though it is not a participant in this market. Because ÍRM is neither a competitor nor a consumer in the relevant market, it must allege a significant causal connection between the alleged soda ash conspiracy and the alleged anti-competitive effects in the terminalling market such that the harm to the terminalling market can be said to be “inextricably intertwined” with the alleged soda ash cartel. McCready, 457 U.S. at 484, 102 S.Ct. at 2551. See also Associated Gen. Contractors, 459 U.S. at 538, 103 S.Ct. at 908 (recognizing the Sherman Act’s “central interest in protecting the economic freedom of participants in the relevant market”); Gregory Marketing Corp. v. Wakefern Food Corp., 787 F.2d 92, 95 (3d Cir.1986) (denying standing to party who was neither competitor nor consumer in relevant market).
IRM, however, has merely alleged that ANSAC has colluded to control the international soda ash market without attempting to forge any link to the competitiveness of the domestic terminalling market.[13] Because IRM has not shown how the decreased competition in the terminalling market of which it complains “flows from that which makes the defendants’ acts unlawful,” Brunswick, 429 U.S. at 489, 97 S.Ct. at 697, IRM fails Brunswick’s second requirement.
IRM’s inability, under Brunswick, to challenge ANSAC’s alleged antitrust violations in the soda ash market without demonstrating a connection with the terminall-ing market comports with the sound prudential considerations undergirding antitrust standing doctrine and general standing requirements. See, for example, Associated Gen. Contractors, 459 U.S. at 542- *1329 45,103 S.Ct. at 910-12 (recognizing prudential concerns underlying antitrust standing restrictions); Caplin & Drysdale v. United States, 491 U.S. 617, 623 n. 3, 109 S.Ct. 2646, 2651 n. 3, 105 L.Ed.2d 528 (1989) (discussing prudential reasons to limit third-party standing). Because IRM is neither a producer nor a consumer of soda ash, it is not the plaintiff best situated to challenge ANSAC’s allegedly unlawful conduct in the soda ash market. That is, IRM cannot be depended upon to advance the strongest arguments identifying the anti-competitive effects in the soda ash market, in which it does not participate. In addition, IRM may not be the best advocate for those who are participants in the soda ash market, who would be more appropriate plaintiffs. “The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party to serve as private attorney general.” Associated Gen. Contractors, 459 U.S. at 542, 103 S.Ct. at 910.
These considerations in turn, underscore another risk created by allowing IRM to challenge ANSAC’s alleged soda ash conspiracy. Because the industrial consumers of soda ash, for example, could still bring suit and raise these same claims, permitting IRM to go forward with this claim creates the risk of duplicative recovery. See Illinois Brick Co. v. Illinois, 431 U.S. 720, 730, 97 S.Ct. 2061, 2067, 52 L.Ed.2d 707 (1977). Given that IRM has made no showing of a connection between the alleged international soda ash conspiracy and the level of competition within the termi-nalling market, these considerations emphasize why IRM is not a proper party to raise this claim.
In a related vein, although IRM also loosely cites a line of cases prohibiting parties that are exempt from antitrust liability from conspiring with non-exempt parties, those cases do not change our analysis. Of those decisions, IRM primarily relies on Beltz Travel Serv., Inc. v. Int’l Air Transport Ass’n, 620 F.2d 1360 (9th Cir.1980). In Beltz, a travel agency and tour operator brought suit against its rival tour operators, two airline trade associations, and the associations’ members. The suit alleged that the defendants had conspired to drive plaintiff from the independent tour operator business in violation of section 1 of the Sherman Act. The district court granted summary judgment for the trade associations and one member[14] on the ground that these defendants were immune from antitrust liability under the Federal Aviation Act of 1958, 49 USC App. § 1382. The Ninth Circuit reversed, holding that the trade associations and their members had lost their statutory immunity by allegedly conspiring with the non-immune tour operators.
IRM also cites Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 231, 99 S.Ct. 1067, 1083, 59 L.Ed.2d 261 (1979), in which independent pharmacists brought an antitrust action against an insurance company and three pharmacies. The plaintiffs alleged that the defendants had entered into agreements to fix the price of drugs and participated in an unlawful boycott of the plaintiffs’s businesses. The Court held that the defendants’ actions were not exempt from antitrust liability under the McCarran-Ferguson Act, 15 USC § 1012(b) (1988), because they did not constitute the “business of insurance” as required by the statute. These agreements constituted only the “business of the insurers” — agreements intended to enable the insurance company to cut costs — and did not involve the contractual relationship between the insurer and the insured. In denying the antitrust exemption under McCarran-Ferguson, the Court acknowledged that “an exempt entity forfeits antitrust exemption by acting in concert with nonexempt parties.” 440 U.S. at 231, 99 S.Ct. at 1083.
However, the rule against conspiracies between immune and non-immune parties stated in Beltz, Group Life, and similar cases does not apply here. In those cases, the alleged conspiracy between the immune and non-immune parties formed the basis *1330 of plaintiff’s cause of action. IRM’s cause of action is based on an entirely different theory, however. As we have already observed, see note 10 and accompanying text on page 1327, IRM seeks to recover for damages caused by an alleged conspiracy to suppress competition in the market for terminalling services, rather than for damages caused by an alleged conspiracy to suppress competition in the soda ash market. We hold that where, as here, the alleged conspiracy between immune and non-immune parties is unrelated to the plaintiff’s cause of action, the plaintiff has no standing to challenge the defendant’s immunity on the basis of the alleged conspiracy.
Moreover, even if IRM could prove that ANSAC had violated the Act’s provisos by conspiring with non-immune parties to depress competition in the market for soda ash, ANSAC would still be entitled to claim immunity regarding the alleged acts and agreements — relating to terminalling services — that form the basis of IRM’s cause of action, for those acts and agreements fall within the scope of the Act. If AN-SAC’s members have conspired with their foreign parents to cartelize the international soda ash market (a matter on which we express no opinion), then they have violated the Act’s provisos because such activity necessarily injures domestic consumers and competitors. In such a case, however, the proper response would be to redress the injuries to those domestic consumers and competitors, rather than to hold that by causing such injuries, ANSAC had forfeited its right to engage in other activities that do not violate the Act’s provisos.
The Act expressly contemplates that an association that engages in activities outside the scope of the immunity conferred by the Act will be permitted to retain its immunity for activities that do fall within the Act’s scope. Specifically, section 5 of the Act, which authorizes the Federal Trade Commission to investigate associations believed to have violated the Act’s provisos, provides that “[u]pon investigation, if [the Commission] shall conclude that the law has been violated, it may make to such association recommendations for the readjustment of its business, in order that it may thereafter maintain its organization and management and conduct its business in accordance with law.” 15 USC § 65 (emphasis added). Accordingly, although Webb-Pomerene associations that have engaged in activities that fall outside of the immunity conferred by the Act have been held liable for those activities, they have also been permitted to continue activities that do fall within the scope of the Act. See, for example, Minnesota Mining, 92 F.Supp. at 966 (enjoining association from implementing parts of agreement that exceed scope of Act, but refusing to .invalidate entire agreement and declining to dissolve association). See also In re Phosphate Export Ass’n, 42 FTC 555 (1946) (recommending that association withdraw from agreements that violate Act’s provisos, but allowing association to continue lawful activities); In re Florida Hard Rock Phosphate Export Ass’n, 40 FTC 843 (1945) (same).
In sum, we conclude that IRM may not base its challenge to ANSAC’s Webb-Pom-erene defense on the alleged conspiracy between ANSAC’s members and their foreign parent corporations.
D. The Terminalling Agreement
IRM argues that ANSAC’s relationship with Hall-Buck effectively puts AN-SAC into the terminalling business, thereby violating the Act’s sole purpose provision, which conditions immunity on the requirement that an association pursue the sole purpose of engaging in export trade. IRM contends ■ that ANSAC is participating in the terminalling business because it profits from shipments made by Hall-Buck’s other customers.
In 1984, several years before ANSAC and Hall-Buck entered into the Terminall-ing Agreement, Hall-Buck proposed an arrangement whereby ANSAC would guarantee to ship 400,000 metric tons of soda ash annually for five years, in return for which ANSAC would receive lower rates and would share in revenues for all soda ash cargoes shipped by other firms. IRM contends that, while the Agreement ANSAC *1331 ultimately entered into with Hall-Buck does not expressly provide for such revenue sharing, it has the same effect. In IRM’s view, the Terminalling Agreement rolls these revenues into the initial rate, rather than giving ANSAC a direct rate based on revenues. Thus, IRM submits that ANSAC profits from these other shipments because the rates Hall-Buck charges its other customers subsidize the low rates it charges ANSAC.
To this end, IRM relies on the affidavit of its expert, Herbert R. Northrup, Professor Emeritus of Management at the Wharton School of the University of Pennsylvania, and on various documents which suggest that the low rates Hall-Buck agreed to charge ANSAC were the result of the higher rates charged to others. In his affidavit, Professor Northrup concludes:
Based upon my review of the documents ... I can state categorically that:
(a) ANSAC has an economic interest in the Port of Portland terminal;
(b) An agreement now exists whereby ANSAC is presently profiting from ter-minalling export products other than soda ash;
(c) An agreement is already in place for ANSAC to profit from terminalling export products at the [Hall-Buck] terminal in the future.
Professor Northrup uses the term “economic interest” to mean “a relationship comparable to that of a joint venturer or partner in a partnership.” He reasons that ANSAC’s economic interest is evidenced by its commitment to pay the unamortized construction costs in the event of non-renewal and by ANSAC’s “dual role as facilitator of the terminal’s construction and benefactor of its operation. Because of its economic interest in the bulk outloading terminal, ANSAC is in fact participating in the business of terminalling not only soda ash, but also other products____” In addition, he maintains that the long-term debt commitment to which ANSAC is obligated is a liability that generates a future obligation. Thus, ANSAC has an ownership interest in the terminal in that it owns an option to purchase a 50 percent interest in the terminal for $1,433,000 and, “[a]s owner of an option to acquire an equity stake in the terminal at a known future date, it is inconceivable that ANSAC would be indifferent to the financial and operating conditions of the terminal.”
ANSAC responds that the Agreement establishes only that ANSAC is Hall-Buck’s customer, and not a participant in the ter-minalling business. It observes that the rates charged to it are fixed by the Agreement and do not fluctuate depending on the volume of business generated by other customers. Thus, ANSAC notes, Hall-Buck, not ANSAC, bears the risk of profit or loss should the anticipated volume from other customers not arise. It further notes that the Agreement expressly states that AN-SAC is an independent contractor whose employees are not controlled by ANSAC, and that ANSAC is not entering the termi-nalling business by its renewal option. ANSAC also rejects the contention that it has a present ownership interest in the terminal. It points out that before such an interest arises, it must decide not to renew the Agreement and then must elect to require that an economic interest be created. Moreover, ANSAC contends that the option was never intended to put it in the termi-nalling business. ANSAC explains that Hall-Buck wanted a commitment for more than five years because it had to make a multimillion dollar capital investment in order to provide terminalling services to AN-SAC. ANSAC states that it was reluctant to commit to more than five years at the time it signed the Agreement because circumstances, such as a reduced export demand or the dissolution of the association, might make that impossible. According to ANSAC, the commitment to pay half the unamortized construction cost operates as a penalty to compensate Hall-Buck in the event ANSAC does not renew; ANSAC’s corresponding right to require the creation of an ownership interest “allow[s] the members to recoup all or some of the penalty for not renewing” by giving them some interest that they can freely sell, assign, or otherwise dispose of.
*1332 The district court concluded that “[t]here is no reason to suspect that ANSAC’s low rate is anything more than a volume discount, such as would be provided to any large customer. 767 F.Supp. at 981 n. 13. In addition, the court determined that the fact that ANSAC maintains an option, exercisable in the future, does not thereby put ANSAC into the terminalling business. Although ANSAC may have an economic interest in the general operations of the terminal, “all users of [Hall-Buck’s] terminal have an interest in the terminal’s overall success and prosperity insofar as their business depends on it.” Id. at 981-82. Finally, the district court concluded that, although “ANSAC may one day enter a relationship with [Hall-Buck] that would jeopardize its Webb-Pomerene status, that point has not been reached as of yet,” and that the indirect economic benefits and potential adverse collateral effects, such as higher rates for other terminal users, “are not a basis for stripping ANSAC of its Webb-Pomerene status____” Id. at 982-83.
On appeal, IRM argues that it raised a disputed issue of material fact as to whether ANSAC entered into a joint venture with Hall-Buck by demonstrating that: (1) Hall-Buck charges shippers of bentonite and talc rates more than double that which it charges ANSAC; (2) these non-soda-ash revenues subsidize ANSAC’s non-compensatory rates; (3) construction of the terminal was contingent upon receiving shipments of products other than soda ash and on ANSAC’s $1.43 million guarantee; and (4) ANSAC has a present economic interest in the operations and finances of the terminal as the owner of an option to purchase 50 percent of the terminal.
The district court’s determination that the Terminalling Agreement did not take ANSAC outside the scope of Webb-Pomer-ene immunity required it to construe the contract and the statute. That determination involved a question of law. See Ram Construction Co. v. American States Ins. Co., 749 F.2d 1049, 1053 (3d Cir.1984) (contract construction, as opposed to contract interpretation, is a question of law). Consequently, the district court’s determination is subject to plenary review.
It may be that ANSAC receives an “economic benefit” from the rates Hall-Buck charges its other customers. IRM alleges, and ANSAC apparently does not dispute, that the revenues derived from the terminalling of soda ash alone would not have provided an adequate return justifying the terminal’s construction. Rather, the operation’s profitability was to come from the shipping of bentonite and talc. The issue, however, is not whether ANSAC benefits by the revenues Hall-Buck receives from its other customers. Rather, the issue is whether the relationship between ANSAC and Hall-Buck goes beyond that of a service provider and customer, so as to conclude that ANSAC has engaged in an endeavor that goes beyond the export of its members’ soda ash.
Principles of joint venture or partnership law are relevant to this determination. Courts generally look to four factors to determine whether the parties to an endeavor are joint venturers:
(1) whether there is an express or implied agreement that demonstrates the parties’ intent to form a partnership or joint venture; (2) whether the parties share a common interest in the subject matter of the joint venture; (3) whether the parties share profits and losses from the venture; and (4) whether the parties have joint control or the joint right of control over the venture.
Harry G. Henn & John R. Alexander, Laws of Corporations 106 (3d ed 1983). A partnership is essentially the same as a joint venture except that a joint venture usually has a more limited purpose. See In re Groff, 898 F.2d 1475, 1476 (10th Cir.1990).
Even assuming that ANSAC is “sharing” in the revenues from Hall-Buck’s other customers in the form of subsidized rates, it is evident that ANSAC has not entered into a risk sharing agreement in relation to the losses or potential losses of the terminal. Without an agreement to apportion losses or potential losses, the relationship does not amount to a joint venture. See, for example, In re PCH Assoc., 949 F.2d 585, 601 (2d Cir.1991); Nelson v. Serwold, *1333 687 F.2d 278, 282 (9th Cir.1982). Although the parties may have calculated ANSAC’s rates on the assumption that Hall-Buck would make up for the low rates from the higher rates charged for bentonite and talc, the risk that the terminal would not generate this business was borne entirely by Hall-Buck. If that business went elsewhere, Hall-Buck nevertheless remained contractually bound to the rates fixed by the Agreement. ANSAC’s rates were subject to escalation only in the event of changes in the consumer price index.
Moreover, ANSAC had no right to control the performance of the business. Although Hall-Buck warranted that the terminal would be operated “in a safe, efficient, and lawful manner, by properly qualified, careful and efficient workers, in conformity with the best practices of this type of work,” and that it would perform under the contract “as expeditiously as practicable” at specified loading rates, Hall-Buck retained “the authority to control and direct the performance of the details of the work.”
Lacking any obligation to share in the losses or in the right to control the performance of the terminal, ANSAC was neither a partner nor a joint venturer with Hall-Buck in the terminalling business. Thus, although in an economic sense their relationship may have been “comparable to that of a joint venturer or partner,” as Professor Northrup states, see page 1331, in a legal sense such a relationship was not achieved. Moreover, the existence of the 50 percent ownership option does not change this result until that option is exercised. Accordingly, the fact that ANSAC was able to secure favorable rates by what the district court described as nothing “more than a volume discount,” 767 F.Supp. at 981 n. 13, did not render its acts or agreements outside the course of export trade.
IV. THE PROPRIETY OF DISPOSING OF THIS CASE ON SUMMARY JUDGMENT
In IRM II, we stated, “This appeal raises complex questions of antitrust law, and a more complete factual record would be helpful to the resolution of some of them.” 898 F.2d at 949. Specifically, we found it impossible to evaluate the legal effect of the relationship between ANSAC and Hall-Buck without additional facts. Id at 949-50. Accordingly, we remanded the case to the district court with instructions to develop a factual record through discovery. Id at 950.
As we noted at page 1321, on remand the district court limited discovery to one issue — the nature of the relationship between ANSAC and Hall-Buck. IRM contends that this limitation contradicts our instructions in IRM II and that it is inconsistent with cases in which judgment on novel questions of law has been deferred until the facts could be developed. See 10A Charles Wright, Arthur Miller, & Mary Kay Kane, Federal Practice & Procedure, § 2725, at 85-89 (2d ed 1983) (citing cases).
The flaw in IRM’s argument lies in failing to acknowledge the background rule that only material issues of disputed fact preclude summary judgment. The apparent goal of IRM’s proposed discovery program is to prove that ANSAC has violated the Webb-Pomerene Act by restraining trade in the market for soda ash. As we have explained at pages 1327-29, IRM lacks standing to pursue this argument. Since this is not a case in which further fact finding would aid our decision of the novel questions of law presented, any dispute over ANSAC’s effect on the soda ash market is therefore immaterial to the disposition of IRM’s suit. Accordingly, we agree with the district court’s determination that no further discovery was warranted.
The judgment of the district court will be affirmed.

. Soda ash, the common name for anhydrous sodium carbonate, is primarily used in making glass.

. As the district court explained:
(1) Defendant Stauffer Chemical Company is wholly owned by the French corporation, Rhone Poulenc Chemie S.A., the third largest producer of soda ash in the world. (2) Defendant TG Soda Ash is wholly owned by the French chemical conglomerate, Societe Natio-nale Elf Aquitaine, a major manufacturer of caustic soda (a soda ash substitute). (3) Defendant Chemical General Partners is forty-nine percent owned by Australian Consolidated Industries, a major re-seller of soda ash. (4) Defendant Tenneco Minerals has entered into a joint venture with Japanese-owned AS-AHI Glass, the largest Japanese producer of soda ash, to exploit Tenneco Minerals’ soda ash reserves. (5) Defendant Kerr-McGee recently sold its soda ash reserves to North American Chemical Company, which is thirty-percent owned by the largest Korean producer of soda ash, Oriental Chemical Industries. (6) Only defendant FMC Wyoming Corporation is not linked to a foreign enterprise significantly engaged in the production or sale of soda ash or caustic soda.
International Raw Materials, Ltd. v. Stauffer Chemical Co., 767 F.Supp. 687, 688 (E.D.Pa.1991) ("IRM III").

. For example, in September 1984, the owner of General Chemical Partners informed IRM that, beginning November 1, 1984, all negotiations for terminalling would have to be pursued through ANSAC. Shortly thereafter, the other soda ash producers followed suit, and those who then had contracts with IRM assigned them to ANSAC.

. These rates ranged from $5.65 to $8.46 per metric ton, depending on tonnage.

. In contrast to the flat rate of $3.72 per metric ton offered by IRM, ANSAC and Hall-Buck agreed to a rate of $3.60 per metric ton up to 500,000 tons and $2.60 per metric ton over that amount.

. The Agreement provides:
The estimated cost of construction of the Terminal is $4,300,000. On the basis of this estimate, and an assumption that the investment cost will be amortized over fifteen (15) years, at the end of the initial five-year term of this Agreement, there will be an unamor-tized cost of $2,866,667. In the event that ANSAC does not renew the contract after the initial five-year term, ANSAC shall pay to Hall-Buck $1,433,333 within thirty (30) days after completion of five years of operation, regardless of the actual investment cost and unamortized cost. ANSAC shall have the option, exercisable by written notice to Hall-Buck, to require that an economic arrangement be entered into between ANSAC and Hall-Buck providing for ANSAC's ownership, in consideration for making the above referenced payment, of 50% of the Terminal.
IRM III, 767 F.Supp. at 690.

. The case was reassigned to a different district judge, the judge originally assigned to the case having become ill.

. The district court had subject matter jurisdiction pursuant to 28 USC §§ 1331 & 1337(a).

. We note that the FTC has expressed the view that foreign ownership or control of an association member does not abrogate the immunity conferred by the Act. An inquiry submitted to the FTC in 1973 asked:
Is it a violation of the antitrust laws of the United States for an export association to include as a member of that association a corporation, incorporated in one of the States of the United States, which is owned or otherwise controlled by foreign interests?
83 FTC 1840 (1973).
In an advisory opinion, the Commission responded:
The Commission is of the opinion that membership in an export (Webb-Pomerene) association by a United States corporation, which is owned or controlled by foreign interests, in and of itself, would not violate the laws administered by the Commission.
Id.
Because the FTC’s interpretation of the Act in its 1973 advisory opinion is in accord with our construction of the statute, we need not decide whether Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), which requires judicial deference to an agency’s legislative rules, overruled General Elec. Co. v. Gilbert, 429 U.S. 125, 141-42, 97 S.Ct. 401, 410-11, 50 L.Ed.2d 343 (1976), which held that an agency’s interpretive decisions demanded less judicial deference. Although the D.C. Circuit has held that an agency’s interpretive decisions should receive Chevron deference, see Wagner Seed Co. v. Bush, 946 F.2d 918, 922 (D.C.Cir.1991), cert. denied, - U.S. -, 112 S.Ct. 1584, 118 L.Ed.2d 304 (1992), this and other courts have not yet decided the issue. See, for example, Griffon v. United States Dep’t of Health & Human Servs., 802 F.2d 146, 148 n. 3 (5th Cir.1986) (leaving unresolved whether Chevron applies to interpretive rules). See also Cass R. Sunstein, Law and Administration after Chevron, 90 Co-lum L Rev 2071, 2093-94 (1990) (Chevron deference should apply only to agency's statutory interpretations pursuant to legislative rulemak-ing authority).

. In a footnote to its opening brief before this court, IRM asserts that the district court "mistakenly assumefd] that IRM was not also a soda ash reseller that competed with ANSAC,” and cites to an affidavit stating that a company affiliated with IRM, Pacific International Raw Materials, Ltd., distributes bulk chemicals, including soda ash, in New Zealand. But this does not suffice. More importantly, IRM’s complaint does not allege that IRM is a consumer or producer of soda ash.

. In a footnote to its reply brief, IRM raises a separate conspiracy theory. It notes that Count II of its amended complaint includes an allegation that ANSAC and its members have corn spired to boycott IRM’s terminal both in the case of ANSAC shipments and of non-ANSAC shipments made by the individual members. Unlike the soda ash market conspiracy theory discussed in the text, this alleged conspiracy is not between immune and non-immune parties. Rather, it involves parties who are immune, but acts — non-ANSAC shipments — that are not. Moreover, and in further contrast to the alleged soda ash conspiracy, this alleged conspiracy constitutes IRM's cause of action.
We need not decide the merits of this second conspiracy theory, however. IRM did not include the theory in its Statement of Issues presented for review on appeal, and did not mention it in its opening brief before this court. We have repeatedly emphasized that failure to raise a theory as an issue on appeal constitutes a waiver because "consideration of that theory would vitiate the requirement of the Federal Rules of Appellate Procedure and our own local rules that, absent extraordinary circumstances, briefs must contain statements of all issues presented for appeal, together with supporting arguments and citations." Simmons v. Philadelphia, 947 F.2d 1042, 1065 (3d Cir.1991), cert. denied, — U.S. -, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992). Accord Brenner v. United Brotherhood of Carpenters and Joiners of America, 927 F.2d 1283, 1298 (3d Cir.1991). By raising the theory for the first time on appeal in its reply brief, IRM has foreclosed our consideration of this issue and has waived reliance on the theory. See Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 205 n. 29 (3d Cir.1990) ("As a general matter, the courts of appeal will not consider arguments raised on appeal for the first time in a reply brief").

. Although this court has articulated some distinction between the concepts of standing and antitrust injury, see, for example, Alberta Gas Chemicals, Ltd. v. E.I. Du Pont De Nemours, 826 F.2d 1235, 1240 (3d Cir.1987) ("Once antitrust injury has been demonstrated by a causal relationship between the harm and the challenged aspect of the alleged violation, standing analysis is employed to search for the most effective plaintiff from among those who have suffered loss”), it has acknowledged that "in the sense that plaintiffs who sustain no antitrust injury may not recover, they may be loosely said to lack standing." Id. In Associated Gen. Contractors, the Supreme Court collapsed the two issues into one broad inquiry. See Associated Gen. Contractors, 459 U.S. at 535-544, 103 S.Ct. at 907-911. In this opinion, we refer to standing and antitrust injury interchangeably. As Professors Areeda and Hovenkamp have explained, the "characterizations are largely immaterial" because the concepts are functionally equivalent. Phillip E. Areeda & Herbert Hovenkamp, 1 Antitrust Law ¶ 334.3 at 377 (1991 Supp).

. In fact, despite the ruling of the district court that IRM lacked standing, see IRM III, 767 F.Supp. at 693 n. 14, on appeal IRM has not presented an argument that it does have standing to raise this claim. Instead, IRM has merely offered an unsupported assertion that ANSAC's actions in the international soda ash market have reduced competition in the terminalling market. It is well-established that a party cannot avoid summary judgment based on mere allegations in its pleadings. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). For this reason, as well as those discussed at page 1333, IRM’s claim cannot survive a motion for summary judgment.

. Process had not been served on the other members.